WILLIAM JAMES, Appellant, *v.* LIBBY, McNEIL & LIBBY, Respondent.

*Sale of sausages under an agreement that they are " dry enough for export " — it relates to the quality and is not a warranty — effect of the acceptance of the sausages by the vendee — agreement to take the sausages back if " too fat and if (vendee's) customers reject them on that account " — consideration therefor — a rejection by public authorities is covered by the agreement.*

Where unsmoked sausages are sold under a contract providing " all microscopically inspected and dry enough for export," the provision " dry enough for export" relates to the quality of the goods and is not, strictly speaking, a warranty.

The quality is a part of the description of the thing agreed to be sold, and if the vendor tenders articles of an inferior quality the vendee is not bound to accept them, but if he does accept them he is, in the absence of fraud, deemed to have admitted that they correspond with the description and is precluded from subsequently questioning that fact.

Where, upon inspecting the goods, the vendee after refusing to accept them, because of an alleged excess of fat therein rendering them unfit for export, asks the vendor, "Will you agree that if these sausages are too fat and if my customer rejects them on that account, will you take them back?" to which the vendor replies, "I will," and upon the execution by the vendor of the following agreement, "I agree * * * if claim is made for too much fat in 100 boxes Farmer to make the same good," the vendee accepts the goods, such agreement on the part of the vendor is founded upon a consideration sufficient to sustain it as against him.

The operation of the agreement is not confined to a case where the vendee's customer refuses to accept the sausages because of the presence of too much fat therein, but it is effective to charge the vendor with liability for the damages resulting to the vendee if the authorities of the country to which the sausages are exported refuse to allow them to be landed because of the excess of fat therein.

APPEAL by the plaintiff, William James, from an order of the Appellate Term of the Supreme Court, entered in the office of the clerk of the county of New York on the 30th day of June, 1904, reversing a judgment of the City Court of the city of New York in favor of the plaintiff, entered in the office of the clerk of said court on the 23d day of February, 1904, upon the verdict of a jury, and an order of said City Court, entered in said clerk's office on the 1st day of March, 1904, which denied the defendant's motion for a new trial made upon the minutes.

*David Gerber*, for the appellant.

*J. Brownson Ker*, for the respondent.

INGRAHAM, J. :

This action is to recover the damages sustained by the plaintiff by the breach of a contract by which the defendant sold to Willard, plaintiff's assignor, certain merchandise. The defendant, a corporation organized under the laws of the State of Illinois, with an office in Chicago, was represented in the city of New York by an agent whose authority is admitted by the answer. The case was tried

before a jury in the City Court, who found a verdict for the plaintiff, from the judgment entered upon which the defendant appealed to the Appellate Term where that judgment was reversed.

Upon the trial it appeared that the contract was in writing, and by it the defendant sold to E. A. Willard, plaintiff's assignor, 1,200 cases of unsmoked sausages, F. O. B., Chicago, "all microscopically inspected and dry enough for export," at a price varying from ten and a half to eleven and five-eighths cents per pound; that 100 cases of these sausages consigned to Willard arrived in New York on the 22d of April, 1899; that when they arrived in New York Willard with an employee, a Mr. Dagelouse, went to the dock where these sausages were, and there met defendant's agent. Willard made an examination of the sausages, and after examination said that the goods did not suit him; that they were too fat, that he was afraid that the French would object to them; and he refused to receive them; that the defendant's agent said that then they would have to stay on the dock; that the sausages were all right; that Willard then offered to accept the sausages if the defendant would deduct two cents per pound, which was refused; that Willard then walked with the defendant's agent to his office, and told the defendant's agent that he wanted to ship the sausages the following day, to which the defendant's agent said, " I cannot do anything further than I have done, because they are all right. If you reject them let them go and I will resell them; " that Willard then said, " Will you agree that if these sausages are too fat, and if my customer rejects them on that account, will you take them back? " to which the defendant's agent said, " I will," and an agreement was then dictated and was signed by the defendant's agent. This agreement was in the form of a letter to Willard and was as follows:

" I agree for Libby, McNeil & Libby  *  *  *  if claim is made for too much fat in 100 boxes Farmer to make the same good. * * *
" (Signed)        J. P. DAVENPORT."

Upon the execution of this instrument Willard accepted the goods and paid for them, and they were shipped to Bordeaux. It was admitted by the defendant that these goods were not permitted to be landed at Bordeaux, France, and were returned to this country. When they were returned here, they were examined by an inspector

of the New York Produce Exchange, who testified that he found the outward appearance of these goods to be mouldy; that there were some of them a little bit slimy; that they were cracked and had air holes, small holes such as you would discern in Swiss cheese; that the holes in the sausages would indicate that the goods had been, at the original packing, not sufficiently dried; that they contained moisture, and also fatty or oily substances which would disseminate through the goods and create globules and make holes in the sausages; that they contained an abundance of fat, a trifle more than is usually put in a dry sausage; that these globules were, in some cases, where the moisture had accumulated and afterwards distributed through the goods; and that the goods were not worth more than fifty or sixty per cent of the original cost.

Upon cross-examination the witness testified that his experience taught him that there was nothing that happened to the goods of an unusual nature in the way of transportation or in general handling that would cause the result that he found upon his examination of the goods in July; that in his opinion the causes existed at the time the goods were originally shipped from the market; that he had seen so many lots of farmers' sausages and had handled them for the largest concerns in the country for export and import; that he knew the proportion of fat usually put in farmers' sausages as compared to other material; that he was in a position to say whether or not more fat than was usually found in farmers' sausages was in these, and that when there is a superabundance it is discernible to the naked eye; that in a majority of farmers' sausages that the witness had seen they are solid, and recognized by the trade as solid; whereas, "if there is a superabundance, an overplus, of the fat, over and above what the meat will take up, it will create globules and holes in the sausage;" that "an accumulation of moisture causes this mouldy condition of the sausages;" and "that the shrinkage that arises in sausages is due to the shrinkage of the lean part of the sausage rather than the fat," and "would indicate that the sausage was not solidly and dryly packed." He further testified upon cross-examination that the difference between farmers' sausages used for domestic purposes, and those used for export, is that as a rule export sausages are supposed to be dryer; "I mean by dryer, not such a percentage of moisture in them, either fat or water, to allow it to

FIRST DEPARTMENT, APRIL, 1905.                    [Vol. 103.

pickle ; " and that in speaking of sausages, when you say they are dry, it means absence of both moisture and fat.

It was further proved that when these sausages were sold after their return to New York, they realized $623.33, leaving a balance between the amount realized and the amount paid by Willard to the defendant of $559.17.

Evidence was introduced by the defendant tending to show that these goods as manufactured were according to the contract. An expert called by the defendant in answer to a question as to what was meant by dryness in a farmer's sausage, said : " Dryness is the evaporation of the moisture. The lean part of the meat is most subject to that evaporation; that shrinks faster. Fat does not shrink at all except when exposed to heat; not very perceptibly, but it does a little; there is a certain amount of moisture in fat ; " that the effect moisture has upon unsmoked farmers' sausages was to make it mouldy, it gets sticky and slimy, and it affects unsmoked farmers' sausages more perceptibly than the smoked farmers' sausages. He further testified that the mere fact that these sausages may have been in the condition testified to by the expert who examined them in July would be no evidence as to what their condition was in April.

There was further evidence that on March fifteenth, upon complaint of Willard that certain sausages, before shipped, had not been dry enough, Davenport, the defendant's agent, stated that he had advised the defendant of the claim, and advised it to have the goods dryer in the future.

I think upon this evidence there was a question for the jury as to whether these sausages complied with the original contract of sale, and were " dry enough for export." Under the original contract of sale this related to the quality of goods sold, and was not strictly speaking a warranty. The quality is a part of the description of the thing agreed to be sold, and the vendor is bound to furnish articles corresponding with the description. If he tenders articles of an inferior quality, the purchaser is not bound to accept them. But if he does accept them, he is, in the absence of fraud, deemed to have assented that they correspond with the description, and is concluded from subsequently questioning it. (*Pierson v. Crooks,* 115 N. Y. 539; *Hardt v. Western Electric Co.,* 84 App. Div.

249.) This obligation being upon the vendee, when these goods arrived in New York they were inspected, but objection was made as to their quality. The plaintiff's assignor refused to accept them and the defendant's agent claimed that they were in accordance with the contract. Undoubtedly an acceptance then of the goods by the vendee would have precluded him from objecting to them upon the ground that they were not of the quality provided for by the contract. There was not, however, an unqualified acceptance. The vendee exacted an agreement from the defendant which provided that " if claim is made for too much fat in 100 boxes Farmer to make the same good," and based upon this agreement the vendee accepted the goods.

It is claimed by the defendant that there was no consideration for this agreement, but I think the consideration was ample. In reliance on the defendant's promise the vendee accepted the goods which he had refused to accept as not a compliance with the contract. The agreement was that if a claim was made that the sausages contained too much fat, the defendant was to make good, which clearly meant that it would be responsible for any loss sustained by the vendee in consequence of that condition of the sausages. I think that the evidence shows that both parties to this contract understood that a sausage which contained too much fat was not dry enough for export; and the reason of this appears from the testimony of the expert who was examined on behalf of the plaintiff. The moisture in the fat does not dry out as it does in the lean, and consequently sausages with too much fat are not dry sausages; in other words, the more fat there is in a sausage, the more moisture there is in it; that the defendant's agent made this agreement to make good any claim for loss because of an excess of fat would indicate that it was the understanding that sausages having an excess of fat would not be such as were provided for by the contract. This provision was inserted in the contract because the vendee wished to export these sausages to Bordeaux, France, and of that the vendor had knowledge. When the defendant undertook to make the sausages dry enough for export, it undertook to make a sausage which would be of such a quality as would be proper for that purpose, and when the vendee refused to accept them upon the ground that they were not of a quality fit for export and the

defendant expressly agreed that if claim was made that they had too much fat it would make it good, this could only refer to too much fat for the purpose for which they were to be used, namely, export. The defendant is responsible because of the fact that these sausages had so much fat, that they were not " dry enough for export," and the defendant had agreed that it would make good to the vendee any loss occasioned by that condition.

There remains only the question as to whether or not there was evidence to show that these sausages were too fat, or not sufficiently dry enough. It is conceded that the sausages were shipped to France, and that the French authorities would not allow them to land, and that they were returned to this country, arriving here in July. They were then examined by an expert who seemed qualified to determine their condition, and this expert testified that from the condition in which he found the sausages they had an excess of fat when manufactured, and that it was this excess of fat that caused the deterioration that he found in the sausages. That evidence was controverted by the defendant, who endeavored to establish the fact that the sausages were properly manufactured, and did not have an excess of fat or moisture when delivered to the plaintiff's assignor. But that was a question for the jury to determine from the evidence. The learned Appellate Term reversed the judgment upon the ground that the acceptance of the sausages was a waiver of the covenant in the original contract of sale ; that it was quite evident from the discussion leading up to the making of this agreement that what both parties understood was that the defendant was to make good to Willard if his customer in France should make claim against him for excessive fat in the sausages ; that as the sausages never reached Willard's customer in France because the French authorities refused to permit them to be landed, no claim for excessive fatness was made upon Willard by his customer.

I do not think that this is a fair construction of the obligation assumed by the defendant at the time of the making of this supplemental agreement. The agreement is not limited to a claim made by Willard's customer. It seems to me that what the parties meant was that if in consequence of there being too much fat in these sausages the vendee sustained damage, for that damage the defendant would be responsible, and that the acceptance of the sausages

would not prevent Willard from making that claim, and viewing, as I think the jury were justified from the evidence in viewing, this understanding that too much fat and too much moisture meant the same thing, so far as the condition of the sausages was concerned, it was a waiver of the effect of the acceptance of the sausages operating as a concession that the defendant complied with the contract.

There are objections taken by the defendants to the charge of the trial judge, and to his rulings upon questions of evidence, but we have examined them and do not think that they justify a reversal of the judgment.

It follows that the determination appealed from must be reversed and the judgment entered upon the verdict of the jury affirmed, with costs to the appellant in this court and in the Appellate Term.

Van Brunt, P. J., Patterson, McLaughlin and Laughlin, JJ., concurred.

Determination reversed and judgment of the City Court affirmed, with costs to appellant in this court and in the Appellate Term.